Vincent E. Bauer
Law Offices of Vincent E. Bauer
112 Madison Avenue, 5th Floor
New York, NY 10016
Ph:  (212) 575-1517
Fax: (212) 689-2726
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

GINA BRIGGS,                                          :
                                                                         Index No.
                                        Plaintiff,       :

                                                         :

              -against-                                :

                                                         :    COMPLAINT

THOMSON REUTERS (TAX & ACCOUNTING) INC,

                                                         :

                                        Defendant.       :

----------------------------------------------------------------------X

        Plaintiff Gina Briggs, by and through her attorneys, The Law Offices of Vincent E.

Bauer, as and for her Complaint, alleges as follows:

        1.  This is an action brought to redress gender discrimination in terms of promotions and

pay, as well as retaliation against Plaintiff by Defendant, culminating in the termination of

Plaintiff's employment.

                        **PARTIES, JURISDICTION AND VENUE**

        2.  Plaintiff resides in Kings County, New York.

3.  Upon information and belief, Defendant Thomson Reuters (Tax & Accounting) Inc. ("Thomson Reuters") is a corporation with a principal place of business (at least as of May 2015) located within New York County, NY.

4.  This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under Title VII raise a federal question, and because this Court has pendent jurisdiction over Plaintiff's state and city law claims.

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to the claim occurred in this district and Defendants are subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

6.  Plaintiff is a 53-year-old woman who was has been repeatedly discriminated against on the basis of her sex in being denied various promotions by her employer, Defendant Thomson Reuters (Tax & Accounting) Inc. ("Thomson Reuters" or "Defendant" or the "Company").  Specifically, she has repeatedly been passed over for promotions because of her sex in favor of less qualified male candidates.  Additionally, Plaintiff and her female colleagues were paid less than their male counterparts for the same work.

7.  Plaintiff is an attorney who was first hired as an Editor for Thomson Reuters to work on the Company's newsletter and database covering state and local tax issues.  Among the states she has covered is New York, which is easily the most significant of the 50 states because of its complicated and comprehensive tax structure.  This job required her to keep up to date on new law, court cases, regulations, administrative rulings, and tax department guidance as soon as they come out so that she could write them up for the Company newsletter, which is updated daily.

8.    As detailed below, the culture in the Company's tax and accounting division discriminates against women and always has.  For example, when Plaintiff first arrived, she was supervised by Jose Curammeng, Managing Editor.  Mr. Curammeng, who, upon information and belief, is a licensed lawyer in the Philippines, though not in the United States, openly discriminated against women.

9.    During the time she worked for Mr. Curammeng, which was from October 2001 through March 2005, Plaintiff was repeatedly given a performance rating of 3.49 out of 4, despite her exemplary performance, so that Mr. Currammeng could round her rating down to 3 and justify giving her a lower raise than two of her male peers, Bob Ziegler and Fidel Mendoza. These lower raises had a cumulative effect as each raise is based on the prior year's salary.  Ann Forster, a former editor who also worked under Mr. Curammeng, reported that he did the same thing to her on her annual evaluations.

10.    In addition to paying women less than similarly situated men, Mr. Curammeng maintained different performance standards based on gender.  For example, his female subordinates were required to provide him with copies of all of their final work product. To Plaintiff's knowledge, the men were not.

11.    In 2005, Plaintiff went to the Director of the State and Local Tax department, Virginia Lorenzo, to complain about Mr. Curammeng's evaluation of her work performance. She demanded that she be reassigned to Sheila Leventhal, another Managing Editor in our group, and that she be compensated for Mr. Curammeng's discriminatory behavior which resulted in Plaintiff's raise being enjoyed by the two men he favored.

3

12.   Plaintiff was immediately reassigned to Ms. Leventhal's team, but Ms. Lorenzo did not address the issue concerning her compensation.   As a consequence, Plaintiff was not compensated for Mr. Curammeng's discriminatory actions.   Plaintiff did not file a formal complaint with Human Resources ("HR") at that time, because she did not believe that the then head of HR, Marlene Kaminsky, would handle the matter appropriately.   Plaintiff was also concerned that Ms. Lorenzo, who had a reputation for vindictiveness, would retaliate against her if she formally complained.

13.   In addition to receiving lower raises due to Mr. Curammeng's discriminatory actions, Plaintiff was told that Mr. Mendoza and another State and Local Editor, Harry Markowitz, were paid much more than the other editors.   Ms. Leventhal told Plaintiff that Mr. Markowitz made more than Ms. Levanthal, even though she is his boss.   The reason for this discrepancy is that both Mr. Mendoza and Mr. Markowitz had previously been directors of the department, but they were both demoted to editor (or senior editor) before 2001.

14.   Despite being demoted, and even though they performed the same work as every other editor in the department, their salaries were not reduced to reflect the salary level of the other editors.   As a consequence, they made much more than the other editors, reducing the pool of funds that could be used to compensate the other editors.

15.   In 2007, Plaintiff applied for the position of Senior Product Manager.   Thomson Reuters did not even interview her for the position.   Ultimately, Plaintiff was told that the position was not going to be filled, and that a male Manager was going to absorb those responsibilities into his then-current position.

16.   In 2009, Plaintiff moved out of the State and Local Tax department to the WG&L Journals group, where she had the job title of Senior Editor.   Plaintiff was told that the senior

editor title for this group was the same position/level as editor in the state and local department.

17.   Plaintiff was also referred to as a managing editor on the masthead for the journals she managed. The thrust of the work was soliciting articles from tax practitioners which Plaintiff then edited for publication in various tax journals.

18.   While Plaintiff was at WG&L Journals, a long term editor died. Instead of hiring a replacement, the work was redistributed; all of the work ended up being shouldered by a few editors, including Plaintiff.   When Plaintiff stated that she thought that that was unfair, she was told by her supervisor that the Managing Editor there, Sandy Lewis, made the decision because she thought that Plaintiff's male coworkers, Bob Murdich and Mark Wolfowitz, would complain about having to do any additional work.

19.   At the time, Plaintiff was the most junior managing editor, yet she was responsible for 12 issues per year, while Messrs. Murdich and Wolfowitz each only had to produce ten issues a year.  Plaintiff did not receive more compensation for the additional work.  It was around that time that Plaintiff became concerned about the status of the group.  It was clear that Ms. Lewis did not have enough authority or influence to convince her supervisors to allow her to hire a replacement for the editor who had died.

20.   In late 2011, Plaintiff learned that the woman who was hired to replace her as Editor for New York was leaving.  Because of the heavier workload that she had in the WG&L group, and because Plaintiff could work a compressed work schedule in the state and local department, Plaintiff contacted Ms. Leventhal to see if Ms. Lorenzo would be interested in having Plaintiff return as editor for New York.  Within ten minutes, Plaintiff was told that she was, and Plaintiff began the process of transferring back to her former position.  The transfer occurred in January 2012.

21.    In 2012, a new project was started known as "Operation Broadside."  Ms. Lorenzo was asked to lead the editorial side of the project.  As a result, her position as director of the State and Local Tax department was to be posted.  It was clear from the beginning that Ms. Lorenzo wanted Mr. Curammeng to get the Director's position (a title above Managing Editor).  Due to Company policy, however, the opening had to be posted.  Not surprisingly, the job description was drafted so that only Mr. Curammeng appeared able to satisfy the requirements.  Nevertheless, both Plaintiff's Managing Editor, Ms. Leventhal, and Plaintiff applied for the job.

22. Ms. Leventhal is a graduate of an Ivy League law school with management experience both within the Company and with a competitor, and Plaintiff had more knowledge of the subject matter than any other applicant.  In addition to having a graduate degree in tax law from NYU, the most respected Tax LL.M. program in the U.S., Plaintiff also practiced tax law at well-known law firms and in-house.

23.  Once Ms. Leventhal and Plaintiff applied for the position, Ms. Lorenzo and the then Publisher (who was also the hiring manager), Linda Scheffel, realized that the position could not be handed to Mr. Curammeng, who, by any standard, was unqualified for the position, particularly in comparison to the female candidates.  Rather than give either Plaintiff or Ms. Leventhal the job, the posting was simply pulled.  Ms. Lorenzo explained at a department meeting some time later that she would responsible for directing both the state and local department and the editorial side of Operation Broadside.  Unlike the other candidates for the Director position, Plaintiff was never formally told that the position was pulled.

24.    To staff Operation Broadside, Matt Pickelle, a Senior Editor from the State and Local Tax group, was made Managing Editor, and two other State and Local Editors--Michael

Siegel and Steve Wang--were placed on the team and promoted to Senior Editors.  Steve Wang

was hired after Plaintiff was, but, unlike most of the male editors, he had experience practicing

tax law at a well-known firm.  Michael Siegel, on the other hand, did not and could not practice

any area of law before coming to the Company -- it was well known within the department that

Mr. Siegel sat for and failed the bar exam at least three times.

26.    Saleem Shareef, another State and Local editor, also applied for the Managing

Editor position, but he was not offered that position.  He declined when asked if he would join

the project as an Editor.  Nevertheless, a few months after declining to join Operation Broadside,

Saleem Shareef was promoted to Senior Editor in state and local tax.  Saleem Shareef was hired

after Plaintiff was.

26.    Plaintiff did not apply for the Operation Broadside team because Ms. Lorenzo was

leading the editorial part of the project.  She was responsible for the management of the State and

Local department, and was or should have been aware of Jose Curammeng's treatment of the

women on his team.  In addition, the nature of the project had changed.  When the project was

first announced by Steve Mendelsohn, then President of the division, he suggested that the

project would be involved in product development.  After Ms. Lorenzo was brought on board,

she determined what the new product would be and looked to hire staff to produce it.

27.    Then in January 2013, a position opened up in Operation Broadside--Director of

Author Acquisitions.  The hiring manager was Ms. Lorenzo.  Plaintiff was surprised that the

position was being offered at the Director level, and Plaintiff applied, because so few higher

level positions had been made available in the 12 years Plaintiff had been at the Company.

28.    Plaintiff also knew she was a good fit for that position, because it required

developing and maintaining relationships with tax practitioners for a new product in which they

would be involved in contributing editorial content.  This is the type of work Plaintiff had been doing at WG&L Journals, except that the tax practitioners for that new project would receive some compensation for their work.  Further, as one of the few Editors in the State and Local Tax group with experience practicing tax law (federal and state and local tax), Plaintiff could comfortably and knowledgeably discuss a variety of tax topics with accountants and tax attorneys.

29.  As Plaintiff reviewed the position description, she noticed that the job qualifications were written in a way that suggested that the description was drafted with a specific candidate in mind.  For example, even though the job required the candidate to contact and maintain relationships with tax practitioners, including attorneys, the qualifications only required a B.A. - a J.D. and/or an LL.M. in Tax was not required.

30. Plaintiff applied for the position, but soon found out that she was correct.  The position description was drafted with a specific candidate in mind, a male candidate from outside the Company, Andrew Popper.  Mr. Popper apparently rejected the offer, and Ms. Lorenzo downgraded the job to an Editor-level position. Plaintiff was never informed about the change in status.  Plaintiff only learned about the downgrade in the position because she contacted the hiring recruiter, Lauren Levy, to see what the status was with regard to the position.  Plaintiff was not extended an interview.

31.  On or around December 16, 2014, the position of director of the State and Local Tax department was again posted.  Plaintiff immediately applied for the position using the same resume and information that she submitted when the position was originally posted in 2012.  Plaintiff understood that Ms. Leventhal, Margaret Eisler, Jose Curammeng, and Matthew Pickelle, all of whom were managing editors, also applied for the position.  On January 13, 2015,

8

Plaintiff was contacted by Lauren Levy, the recruiter assigned to the position, who told her that the position "fell under" Ms. Lorenzo and that, "[u]nfortunately at this time, she is only considering candidates who are currently Managing Directors at TR."

32.    Plaintiff explained to Ms. Levy her frustration in being denied an interview for the position, adding that when the position had been posted in 2012 she had been extended the courtesy of an interview and was interviewed for the position before it was pulled.  Ms. Levy acknowledged Plaintiff's frustration, but stated that "per Virginia Lorenzo and Jim Fegen's requirement, they are only considering Managing Editors at this time due to the Director level being a next step in job grade and career progression."

33.    The evidence of sex discrimination in promotions is not only anecdotal.  Plaintiff had been an Editor since she arrived at Thomson Reuters in 2001.  As of early 2013, if you looked at demographics for the Senior Editor position, there were 17 employees who have been editors in the State and Local Tax department for five years or more: nine men and eight women. Of these, eight of the nine men had been promoted to Senior Editor, while only one of the eight women had been promoted.  If you looked at the entire staff, including those with less than five years' experience, eight of 14 men had been promoted to Senior Editor, but only one of 17 women.

34.    Further, those promotions did not require application.  They were just handed out by the Director, Ms. Lorenzo, as she saw fit and without any oversight.  That failure to promote was critical, because experience as a Senior Editor position was a stepping stone to Managing Editor and Director-level promotions.  Moreover, it was a transparent way of paying favored male editors more than their female counterparts for the same job.

35.   Additionally, only one of the male Senior Editors had an advanced graduate degree in tax, while at least one other female editor, Samantha Fong, and Plaintiff had LL.Ms in Tax from NYU, yet neither of them had been promoted.  Further, both Ms. Fong and Plaintiff had actually practiced tax law at a law firm, while only one male Senior Editor, Steve Wang, had experience practicing tax law at a law firm.

36.   In addition to being discriminated against on the basis of her gender, Plaintiff also suffered retaliation for her complaints of sex discrimination.  In that regard, Plaintiff filed her original charge with the EEOC on May 17, 2013.   Since then, Defendant terminated her coworker and friend, Bo Tan, who had been employed in Thomson's Human Resources Department.  Although the Company told Ms. Tan that she was being fired because she failed to relay concerns Plaintiff had about how she was being treated at work, that statement was nonsense.   Ms. Tan was terminated in an effort to chill Plaintiff and her coworkers from exercising our civil rights.

37.   Subsequently, on February 13, 2015, Plaintiff's employment was terminated.  That termination was based upon the allegation that, on February 9, during a private conversation with supervisor, Ms. Leventhal, Plaintiff said that she would "shoot the place up", a supposed reference to workplace violence.  Plaintiff made no such statement, and the suggestion she had is absurd.

38.   Instead, Plaintiff, in the context of raising rather mundane concerns about the lack of guidance and clarity provided in connection with a departmental project, stated "I'm shaking things up, I'm digging in my heels, and I'm not going away". Her statements were references to

her EEOC charge, a decidedly non-violent way to address workplace concerns.   Thomson

Reuters apparently seized upon a simple misunderstanding to fire Plaintiff, knowing that she had

not engaged in the alleged conduct.   In that regard, to Plaintiff's knowledge, almost no

investigation of the allegations (except for securing from Plaintiff a detailed, credible denial) was

conducted.


FIRST CAUSE OF ACTION
DISCRIMINATION IN VIOLATION OF TITLE VII

39.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 38 as

though fully set forth herein.

40.    Defendant's intentional discrimination against Plaintiff on the basis of her sex, as

described above, constitutes a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000e et seq.

41.    As the direct and proximate result of Defendant's violation of that statute, Plaintiff

suffered economic damages and emotional pain and suffering, for which Defendant is liable.


SECOND CAUSE OF ACTION
DISCRIMINATION IN VIOLATION OF N.Y. EXECUTIVE LAW

42.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 41 as

though fully set forth herein.

43.    Defendant's intentional discrimination against Plaintiff on the basis of her sex, as

described above, constitutes a violation of the New York Executive Law § 296, et seq.

44.   As the direct and proximate result of Defendant's violation of that statute, Plaintiff suffered

economic damages and emotional pain and suffering, for which Defendant is liable.

THIRD CAUSE OF ACTION
DISCRIMINATION IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE

45.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 44 as though fully set forth herein.

46.    Defendant's discrimination against Plaintiff on the basis of her sex, as described above, constitutes a violation of the New York City Administrative Code provisions concerning discrimination.

47.    As the direct and proximate result of Defendant's violation of those provisions, Plaintiff suffered economic damages and emotional pain and suffering, for which Defendant is liable.

FOURTH CAUSE OF ACTION
RETALIATION IN VIOLATION OF N.Y. EXECUTIVE LAW

48.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as though fully set forth herein.

49.    Defendant's retaliation against Plaintiff as the result of Plaintiff's complaints concerning Defendant's discriminatory practices, as described above, constitutes a violation of  the New York Executive Law § 296, et seq.

50.    As the direct and proximate result of Defendant's violation of that statute, Plaintiff suffered economic damages and emotional pain and suffering, for which Defendant is liable.

FIFTH CAUSE OF ACTION
RETALIATION IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE

51.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 50 as though fully set forth herein.

52.    Defendant's retaliation against Plaintiff as the result of her complaints concerning Defendants' discriminatory practices, as described above, constitutes a violation of the New York City Administrative Code provisions concerning retaliation.

53.    As the direct and proximate result of Defendant's violation of those provisions, Plaintiff suffered economic damages and emotional pain and suffering, for which Defendant is liable.

SEVENTH CAUSE OF ACTION<br>PAY DISCRIMINATION  IN VIOLATION OF THE EQUAL PAY ACT OF 1963

54.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 53 as though fully set forth herein.

55.    Defendant's payment of male employees at a rate greater than that of female employees, including Plaintiff, who performed the same job as their male counterparts, as described above, constitutes a violation of the Equal Pay Act of 1963.

56.    As the direct and proximate result of Defendant's violation of that statute, Plaintiff suffered economic damages and emotional pain and suffering, for which Defendant is liable.

WHEREFORE, Plaintiff demands judgment:

1.    For economic, compensatory, and punitive damages in an amount to be determined at trial;

2.    For reasonable costs and attorneys' fees incurred in connection with the prosecution of this action; and

3.    For such other and further relief as the Court deems proper, together with the costs and disbursements of this action.

A jury trial of this action is hereby demanded.

Dated:      July 14, 2015
            New York, NY

                              _____s/_____
                              Vincent E. Bauer
                              Law Offices of Vincent E. Bauer
                              112 Madison Avenue, 5th Floor
                              New York, NY 10016
                              Ph:  (212) 575-1517
                              Fax: (212) 689-2726
                              Attorneys for Plaintiffs